Jasmina Richter/Bar No. 024180
John C. Quinn/Bar No. 032231
**SANDERS & PARKS, P.C.**
3030 North Third Street, Suite 1300
Phoenix, AZ 85012-3099
Direct Phone: (602) 532-5779
E-Mail: jasmina.richter@sandersparks.com
Firm E-Mail : minutes@sandersparks.com

John C. Quinn
Direct Phone: (602) 532-5631
E-Mail: john.quinn@sandersparks.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| National Union Fire Insurance Company of Pittsburgh, PA., a Pennsylvania company, | Case No.: _____ |
| Plaintiff, | **COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** |
| v. | |
| 3137 Willow Creek Road, LLC, an Arizona limited liability company; Decca Multi-Family Builders, Inc., an Arizona corporation; and Legacy Roofing, LLC, an Arizona limited liability company. | (_____) |
| Defendants. | |

Plaintiff National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") by and for its Complaint hereby alleges as follows:

### NATURE OF THE ACTION

1.      This is a civil action for declaratory relief through which National Union seeks a declaratory judgment, under 28 U.S.C. § 2201 et seq., that the Commercial Excess Liability Policy No. 27731677, effective from October 11, 2015 to October 11, 2016 issued to the Named Insured Legacy Roofing, LLC ("Legacy") provides no coverage for the claims and damages sought in an action currently pending in the Superior Court of Arizona

1    for Yavapai County entitled *Decca Multi-Family Builders, Inc. v. 3137 Willow Creek*

2    *Road, LLC et. al.*, Case No. P-1300-CV-201700675 (the "Underlying Action").

3        2.      Through this action, National Union seeks a determination that National

4    Union has no indemnity or defense obligations towards Legacy, or any other claimed

5    insured or assignee of any insured's rights, including but not limited to, 3137 Willow Creek

6    Road, LLC ("Willow Creek") or Decca Multi-Family Builders, Inc. ("Decca").

7                              **PARTIES, JURISDICTION AND VENUE**

8        3.      Plaintiff National Union is a Pennsylvania corporation with its principal

9    place of business in the State of New York and is therefore a citizen of Pennsylvania and

10   New York as defined by 28 U.S.C. § 1332 (c)(1).

11       4.      Defendant Legacy is a limited liability company with its principal place of

12   business in Arizona.  The sole member of Legacy is Toby Ebarb.  Upon information and

13   belief, Toby Ebarb is a resident and citizen of Arizona.

14       5.      Defendant Willow Creek is a limited liability company with its principal

15   place of business in Arizona.  The sole member of Willow Creek is The RCJ Irrevocable

16   Trust, and the manager is Robert Cole Johnson.  Upon information and belief, the trustee

17   of The RCJ Irrevocable Trust is Robert Cole Johnson, who is a resident and citizen of

18   Arizona.  Therefore, Willow Creek is a citizen of Arizona as defined by 28 U.S.C. § 1332.

19       6.      Defendant Decca is an Arizona corporation with its principal place of

20   business in Arizona and is therefore a citizen of Arizona as defined by 28 U.S.C. § 1332

21   (c)(1).

22       7.      The amount in controversy in this action exceeds $75,000.00, exclusive of

23   interest and costs, and is between citizens of different states.  Notably, Willow Creek and

24   Decca seek to enforce a stipulated judgment in the amount of $5,500,000.00 against

25   National Union.  Thus, this Court has diversity jurisdiction over this action under 28 U.S.C.

26   § 1332.

27

28

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) and (2) because the Defendants reside in this District and the events giving rise to this action occurred in this District.

9.     An actual case or controversy has arisen between the parties because Willow Creek and Decca have filed claims in the Underlying Action against Legacy. National Union has accepted the defense of Legacy subject to a reservation of rights. Willow Creek and Decca, on the one hand, and Legacy, on the other hand, have entered into a Settlement Agreement and Assignment of Rights (the "Legacy Settlement"). See Ex. 1.

10.     Willow Creek and Decca seek to enforce a stipulated judgment against Legacy for $5,500,000.00 against National Union. As such, an actual controversy exists that requires a judicial declaration to determine the respective rights and obligations of the parties.

## UNDERLYING LAWSUIT

11.     Willow Creek was the owner of an apartment complex located at 3137 Willow Creek Road, Prescott, Arizona (the "Project").

12.     Willow Creek contracted with Fergis & Associates to provide professional design and construction administration services for the Project.

13.     Decca was the general contractor under a prime contract with Willow Creek relating to the Project.

14.     Employers Mutual Casualty Company ("EMC") issued performance and payment bonds with respect to the Project to its principal Decca.

15.     On or about May 27, 2016, Decca and Legacy entered into a Subcontract Agreement under which Legacy agreed to perform certain work with respect to the Project, and Decca agreed to pay Legacy for the work.

16.     Various disputes arose between Decca, Willow Creek, EMC, Legacy, and others regarding the construction of the Project.

17.     For instance, in March and/or April 2017, Willow Creek alleged that it discovered moisture intrusion into the Project and halted construction to investigate.

18.     On September 15, 2017, Decca filed a lawsuit against Willow Creek, Fergis & Associates, Chris Fergis, and Jane Doe Fergis, in Yavapai County Superior Court, Case No. P-1300-CV-201700675.

19.     Decca alleged that Fergis & Associates breached its professional duty to prepare the plans and specifications with reasonable care and breached its construction administration duties.

20.     Decca asserted claims against Fergis & Associates and Chris Fergis for: (1) professional negligence; (2) breach of implied warranty; (3) bad faith; and (4) interference with contract.

21.     Decca also asserted claims against Willow Creek for: (1) breach of implied warranty; (2) prompt pay act violations; (3) breach of contract; (4) breach of fiduciary duty; and (5) bad faith.

22.     On January 10, 2018, Willow Creek filed its Answer and counterclaim against Decca and EMC, including: (1) breach of HUD construction contract; (2) breach of underground construction contract; (3) breach of the implied covenant of good faith and fair dealing; (4) breach of implied warranty; (5) breach of fiduciary duty; (6) fraud; (7) fraudulent concealment; (8) declaratory judgment; (9) tortious interference with business expectancy/prospective business relationship as to HUD; (10) tortious interference with business expectancy/prospective business relationship as to Red Mortgage Capital, LLC; (11) tortious interference with business expectancy/prospective business expectancy as to the City of Prescott; (12) tortious interference with business expectancy/prospective business relations as to Wells Fargo; (13) civil conspiracy; (14) negligence.

23.     Willow Creek also asserted claims against various subcontractors hired by Decca, including Legacy.

24.     The claims by Willow Creek against the subcontractors were later dismissed and the dismissal was affirmed on appeal.

25.    On January 26, 2018, Decca filed an Amended Answer to Willow Creek's Counterclaim, Cross-Claims and a Third-Party Complaint against various subcontractors, including Legacy.

26.    Decca asserted the following claims against the named subcontractors: (1) indemnification; (2) breach of contract; (3) breach of express warranty; (4) breach of implied warranty; (5) negligence; (6) declaratory judgment.

27.    On or about June 13, 2022, after receiving notice of the claim in May of 2022, National Union prepared a letter acknowledging notice of the claim and requesting information about the claim.

28.    Willow Creek has attributed the following non-exhaustive list of defects to Legacy's work: improper flashing at all buildings; improper use of torches in parapets; improper roofing underlayment and ice shield installation at all buildings; and, improper scupper installation at buildings 1 through 6.

29.    However, the information provided to National Union did not show any resultant damage within its policy period (i.e., before October 11, 2016).

30.    On December 19, 2022, Legacy's primary insurer, Endurance American Specialty Insurance Company ("Endurance"), informed National Union that it would be making an offer to Decca of its aggregate limit of $2M under its second policy, effective from October 11, 2016 to October 11, 2017 (the "Endurance 2016-2017 Policy").

31.    On or about December 21, 2022, Decca, EMC and Willow Creek entered into a settlement agreement (the "Decca Settlement").

32.    As part of the Decca Settlement, Willow Creek claims that it has been assigned all of Decca's and EMC's rights against Legacy, under the Subcontract between Legacy and Decca, and is pursuing those assigned claims in the Underlying Action.

33.    In a court order dated July 6, 2023, the court in the Underlying Action ruled that the Decca Settlement and stipulated judgment were not binding on the subcontractors including Legacy.

34.    Throughout the Underlying Action, Willow Creek repeatedly asserted that its claimed damages involved multiple occurrences, including in a correspondence dated April 11, 2023.  See Ex. 2.

35.    On September 25, 2023, Willow Creek and Legacy Roofing entered into a settlement agreement. See Ex. 3.

36.    As part of that agreement, Endurance agreed to pay $2M and allocated that payment as follows: $1M under Policy No. CBC20000808700, policy period of October 11, 2015 to October 11, 2016 (the "Endurance 2015-2016 Policy"), and $1M under the Endurance 2016-2017 Policy.

37.    In addition, under paragraph 5 of the agreement, Willow Creek contractually obligated itself to offer Legacy a purported Morris agreement in the form attached as Exhibit C to the agreement, if National Union provided a qualified defense and reserved its rights.

38.    At the time of the September 25, 2023 settlement agreement, National Union had previously agreed to provide a defense to Legacy subject to a reservation of rights.

39.    On or about March 22, 2024, Legacy and Willow Creek entered into a purported Morris agreement (the "Morris Agreement").  *See* Ex. 1.

40.    As part of the purported Morris agreement, Legacy agreed to a stipulated judgment against Legacy and in favor of Decca and Willow Creek jointly for $5.5M.

41.    Further, under paragraph 3, the purported Morris agreement provided that Legacy assigned to Willow Creek all its rights under the National Union policy.

42.    Under paragraph 4 of the purported Morris agreement, Willow Creek covenanted not to execute on the stipulated judgment against Legacy and would only seek enforcement against National Union.

## THE NATIONAL UNION POLICY

43.    National Union issued a Commercial Excess Liability Policy to the Named Insured Legacy Roofing, LLC, policy number 027731677, effective from October 11, 2015 to October 11, 2016 (the "Excess Policy").

44.    The Excess Policy provides commercial excess liability coverage with limits of $3,000,000 each occurrence and $3,000,000 general aggregate and products completed operations aggregate.

45.    The Schedule of Underlying Insurance lists the general liability policy issued by Endurance American Specialty Ins. Co., effective from October 11, 2015 to October 11, 2016, with limits of $1,000,000 per occurrence, $2,000,000 general aggregate, $2,000,000 products and completed operations aggregate and $2,000,000 per project general aggregate.

46.    The Excess Policy provides in the insuring agreement, in relevant part, as follows:

**I. INSURING AGREEMENT—COMMERCIAL EXCESS LIABILITY**
A.  We will pay on behalf of the **Insured** those sums in excess of the **Retained Limit** that the **Insured** becomes legally obligated to pay as damages by reason of liability imposed by law because of **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** to which this insurance applies or because of **Bodily Injury** or **Property Damage** to which this insurance applies assumed by the **Insured** under an **Insured Contract**.  Coverage under this policy will follow the terms, definitions, conditions and exclusions of the **Scheduled Underlying Insurance**, subject to the **Policy Period**, Limits of Insurance, premium and all other terms, definitions, conditions and exclusions of this policy.  Provided, however, that coverage provided by this policy will not be broader than coverage provided by the policy listed in the **Scheduled Underlying Insurance**.

The amount we will pay for damages is limited as described in Section IV, Limits of Insurance.

B.  This policy applies, only if:
1.  The Bodily Injury or Property Damage is caused by an Occurrence that takes place anywhere, and the Bodily Injury or Property Damage occurs during the Policy Period; and
2.  The Personal Injury and Advertising Injury is caused by an Occurrence that takes place anywhere arising out of your business, but only if the Occurrence was committed during the Policy Period.
                                        ***

### III. DEFENSE PROVISIONS

A.  We will have the right and duty to defend any **Suit** against the **Insured** that seeks damages for **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** covered by this policy, even if the **Suit** is groundless, false or fraudulent when the total applicable limits of the **Scheduled Underlying Insurance** have been exhausted by payment of Loss to which this policy applies and the total applicable limits of **Other Insurance** have been exhausted.

\*\*\*

B.  We will have no duty to defend the Insured against any Suit seeking damages for Bodily Injury, Property Damage or Personal Injury and Advertising Injury to which this insurance does not apply.

\*\*\*

D.  Except as provided in Paragraph A above, we will have no duty to defend any Suit against the Insured. We will, however, have the right, but not the duty to participate in the defense of any Suit and the investigation of any claim to which this policy may apply. If we exercise that right, we will do so at our own expense.

47.     The Excess Policy also provides, under Section IV. Limits of Insurance, in relevant part, as follows:

A.  The Limits of Insurance shown in Item 3 of the Declarations and the rules below state the most we will pay for all damages under this policy regardless of the number of:
   1. **Insureds**;
   2. claims made or **Suits** brought;
   3. persons or organizations making claims or bringing **Suits**; or
   4. coverages provided under this policy.

\*\*\*

D.  Subject to Paragraphs B and C above, the Each Occurrence Limit stated in Item 3A of the Declarations is the most we will pay for the sum of all damages arising out of any one **Occurrence**.

\*\*\*

M.  We will not make any payment under this policy unless and until the total applicable limits of **Scheduled Underlying Insurance** have been exhausted by the payment of **Loss** to which this policy applies and any applicable **Other Insurance** have been exhausted by the payment of **Loss.**

When the amount of **Loss** has been determined by an agreed settlement or a final judgment, we will promptly pay on behalf of the **Insured** the amount of such **Loss** falling within the terms of this policy. An agreed settlement means a settlement and release of liability signed by us, the **Insured** and the claimant or the claimant's legal representative.

* * *

48.    The Excess Policy also provides in the exclusions section, in relevant part, as follows:

**V. EXCLUSIONS**

***

**C. Contractors**

This insurance does not apply to:

***

2. **Property Damage** to property being installed, erected or worked upon by the **Insured** or by any agents or subcontractors of the **Insured**; or

***

**D. Contractual Liability**

This insurance does not apply to any liability for which the **Insured** is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply for damages:

1. that the **Insured** would have in the absence of a contract or agreement; or

2. assumed in an **Insured Contract**, provided **Bodily Injury** or **Property Damage** occurs subsequent to the execution and prior to the termination of the **Insured Contract**. Solely for the purposes of liability assumed in an **Insured Contract**, reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an **Insured** are deemed to be damages because of **Bodily Injury** or **Property Damage** and included in the Limits of Insurance of this policy, provided:

   a. liability to such party for, or for the cost of, that party's defense has also been assumed in the same **Insured Contract**; and

   b. such attorney fees and litigation expenses are for the defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this policy applies are alleged.

***

**F. Damage to Impaired Property or Property Not Physically Injured**

This insurance does not apply to **Property Damage** to **Impaired**

**Property** or property that has not been physically injured, arising out of:

1. a defect, deficiency, inadequacy or dangerous condition in **Your Product** or **Your Work**; or
2. a delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to **Your Product** or **Your Work** after it has been put to its intended use.

\* \* \*

**G. Damage to Property**

This insurance does not apply to **Property Damage** to:

\*\*\*

5. that particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the **Property Damage** arises out of those operations; or
6. that particular part of any property that must be restored, repaired or replaced because **Your Work** was incorrectly performed on it.

\*\*\*

Paragraph 6 of this exclusion does not apply to **Property Damage** included in the **Products-Completed Operations Hazard**.

**H. Damage to Your Product**

This insurance does not apply to **Property Damage** to **Your Product** arising out of it or any part of it.

**I. Damage to Your Work**

This insurance does not apply to **Property Damage** to **Your Work** arising out of it or any part of it and included in the **Products-Completed Operations Hazard**.

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

\* \* \*

**M. Fungus(i), Mold(s), Mildew or Yeast**

This insurance does not apply to **Bodily Injury**, **Property Damage** or **Personal Injury** and **Advertising Injury** or any other loss, injury, damage, cost or expense, including clean up costs that is, but not limited to, losses, costs or expenses related to, arising from or associated with clean-up, remediation, containment, removal or abatement, caused directly or indirectly, in whole or in part, by:

a. Any **Fungus(i)** or "spore(s)", or, **Molds(s)**, mildew or yeast, or

b. Any **Spore(s)** or toxins created or produced by or emanating from such **Fungus(i)**, **Mold(s)**, mildew or yeast, or

c. Any substance, vapor or, gas, or other emission or organic or inorganic body or substance produced by or arising out of any **Fungus(i)** or "spore(s)", or, **Mold(s),** mildew or yeast, or

d. Any material, product, building component, building or structure, or any concentration of moisture, water or other liquid within such material, product, building component, building or structure, that contains, harbors, nurtures or acts as a medium for any **Fungus(i)** or, **Mold(s)**, mildew, yeast, or **Spore(s)** or toxins emanating therefrom.

Paragraphs a., b., c. and d. above apply regardless of any other cause, event, material, product and/or building component that contributed **concurrently** or in any sequence to that loss, injury or , damage., cost or expense.

\* \* \*

**V. Recall of Your Product, Your Work or Impaired Property**
This insurance does not apply to damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
1. **Your Product**;
2. **Your Work**; or
3. **Impaired Property;**
if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

\* \* \*

**Y. Subsidence**
This insurance does not apply to any liability arising out of subsidence, settling, sinking, slipping, falling away, caving in, shifting, eroding, mud flow, rising, tilting or any other movement of land or earth.

49.    The Excess Policy also provides, under Section VII. Definitions, in relevant part, as follows:

**VI. DEFINITIONS**
\* \* \*

**K. Fungus(i)** includes, but is not limited to, any of the plants or organisms belonging to the major group Fungi, lacking chlorophyll, and including molds, rusts, mildews, smuts and mushrooms.

**M. Impaired Property** means tangible property, other than **Your Product**

or **Your Work**, that cannot be used or is less useful because:

    1. it incorporates **Your Product** or **Your Work** that is known or thought to be defective, deficient, inadequate or dangerous; or

    2. you have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

    1. the repair, replacement, adjustment or removal of **Your Product** or **Your Work**; or

    2. your fulfilling the terms of the contract or agreement.

\* \* \*

**O. Insured Contract** means that part of any contract or agreement pertaining to your business under which any **Insured** assumes the tort liability of another party to pay for **Bodily Injury** or **Property Damage** to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement . . .

\* \* \*

**Q. Loss** means those sums actually paid as judgments or settlements, provided, however, that if expenses incurred to defend a **Suit** or to investigate a claim reduce the applicable limits of **Scheduled Underlying Insurance**, then

    **Loss** shall include such expenses.

\* \* \*

**U. Occurrence** means:

    1. as respects **Bodily Injury** or **Property Damage**, an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general harmful conditions will be deemed to arise out of one **Occurrence**. In the event of continuing or progressively deteriorating damage over any length of time, such damage shall be deemed to be one **Occurrence** and shall be deemed to occur only when such damage first commenced.

    2. as respects **Personal Injury and Advertising Injury**, an offense arising out of your business that causes **Personal Injury and Advertising Injury**. All damages that arise from the same, related or repeated injurious material or act will be deemed to arise out of one **Occurrence**, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

**V. Other Insurance** means a valid and collectible policy of insurance providing coverage for damages covered in whole or in part by this policy.

However, **Other Insurance** does not include **Scheduled Underlying**

**Insurance** or any policy of insurance specifically purchased to be excess of this policy affording coverage that this policy also affords.

\* \* \*

X. **Policy Period** means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of termination of this policy.

\* \* \*

Z. **Products-Completed Operations Hazard** means all **Bodily Injury** and **Property Damage** occurring away from premises you own or rent and arising out of **Your Product** or **Your Work** except:

1. products that are still in your physical possession; or
2. work that has not yet been completed or abandoned. However, **Your Work** will be deemed completed at the earliest of the following times:
   a. when all of the work called for in your contract has been completed;
   b. when all of the work to be done at the job site has been completed if your contract calls for work at more than one job site; or
   c. when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**Products-Completed Operations Hazard** does not include **Bodily Injury** or **Property Damage** arising out of:

1. the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you and that condition was created by the loading or unloading of that vehicle by any **Insured**; or
2. the existence of tools, uninstalled equipment or abandoned or unused materials.

\* \* \*

AA. **Property Damage** means:

1. physical injury to tangible property, including all resulting loss of use of that property. All such loss of use will be deemed to occur at the time of the physical injury that caused it; or
2. loss of use of tangible property that is not physically injured. All such loss of use will be deemed to occur at the time of the **Occurrence** that

caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks,

CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

BB. **Retained Limit** means the total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance** providing coverage to the **Insured.**

CC. **Scheduled Underlying Insurance** means:

1.  the policy or policies of insurance and limits of insurance shown in the Schedule of Underlying Insurance forming a part of this policy; and
2.  automatically any renewal or replacement of any policy in Paragraph 1 above, provided that such renewal or replacement provides equivalent coverage to and affords limits of insurance equal to or greater than the policy being renewed or replaced.

**Scheduled Underlying Insurance** does not include a policy of insurance specifically purchased to be excess of this policy affording coverage that this policy also afford.

***

II. **Your Work** means:

1.  work or operations performed by you or on your behalf; and
2.  materials, parts or equipment furnished in connection with such work or operations.

**Your Work** includes:

1.  warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **Your Work**; and
2.  the providing of or failure to provide warnings or instructions.
3.  the providing of or failure to provide warnings or instructions.

50.     In addition to the Excess Policy terms described herein, there also may be no coverage for the Underlying Action based on other terms, conditions, endorsements, definitions, and/or exclusions, which National Union hereby reserves and does not waive.

## THE ENDURANCE POLICIES

51.     The Schedule of Underlying Insurance lists the general liability policy issued by Endurance, effective from October 11, 2015 to October 11, 2016, with limits of $1,000,000 per occurrence, $2,000,000 general aggregate, $2,000,000 products and completed operations aggregate and $2,000,000 per project general aggregate.

52.     The Endurance 2015-2016 Policy includes the following exclusions: "**a. Expected Or Intended Injury**;" "**b. Contractual Liability**;" "**j. Damage To Property**;" "**k. Damage To Your Product**;" "**m. Damage To Impaired Property or Property Not Physically Injured**;" and "**n. Recall of Products, Work Or Impaired Property**."

53.     The Endurance 2015-2016 Policy also includes a "Roofing Operations Endorsement" that provides as follows:

**A. Open Roof**

1.    The contractor shall cover all "open roofs" if the roof is to be left unattended.  Contractors must take "appropriate" steps to determine adverse weather and provide "appropriate" temporary waterproof covering, able to withstand the elements. If the contractor fails to do either, any resulting "property damage" to any building or structure or its contents will not be covered by this policy.

2.    The term "open roofs" as used in this endorsement shall include any roof or sections thereof where any protective covering has been removed leaving exposed the wood shell or any section thereof.

3.    The term "appropriate" as used in this endorsement shall mean that conduct or action customarily taken or used by similar roofing contractors in the job-site jurisdiction to protect or prevent damage, or which is customarily done by contractors in the same field under similar circumstances.

**B. Hot Tar or Heat Application Work:**

1. The insured will conduct a diligent inspection of any hot tar or heat application work by the insured, immediately preceding the insured's departure from the premises. The insured will have a designated employee complete a signed and dated written report of each inspection showing the time of the completion of work and the time of the inspection. Copies of all reports shall be maintained by the insured at the insured's office. "We" can request copies of reports at any time.

2. The insured will remain at the job-site of any hot tar or heat application job-site for a period of not less than one hour after the hot tar or heat application process has been completed. The insured will have a designated employee complete a written report stating at the time the hot tar or heat application was finished and the time the insured left the job site. The report must be signed and dated the day of the work and a copy maintained at the insured's office. "We" can request copies of reports at any time.

3. The insured will have at hand a functional, fully charged 15lb. or larger dry chemical fire extinguisher during any hot tar or heat application process work.

4. If the insured fails to meet any of the warranty conditions stated above, any resulting property damage to any building or structure or its contents will not be covered by this policy.

5. In the event of a claim involving hot tar or heat application "we" will require that the designated employee complete an affidavit testifying to the warranty conditions stated above.

54. Further, by endorsement, the Endurance Policy also includes a "Mold, Fungus, Bacteria, Virus and Organic Pathogen Exclusion," which precludes coverage for "property damage" "arising directly or indirectly, or in concurrence or in any sequence out of or in any way relating to actual, alleged or threatened existence, discharge, dispersal, release or escape or 'organic pathogens,' whether or not such actual, alleged or threatened existence, discharge, dispersal, release or escape is sudden, accidental or gradual in nature."

55. Endurance also issued a general liability policy, effective from October 11, 2016 to October 11, 2017, with limits of $1,000,000 per occurrence, $2,000,000 general

- 16 -

aggregate, $2,000,000 products and completed operations aggregate and $2,000,000 per project general aggregate.

56.    Upon information and belief, the Endurance 2016-2017 Policy contains substantially the same terms as the Endurance 2015-2016 Policy.

57.    In addition to the Endurance Policy terms described herein, there also may be no coverage for the Underlying Action based on other terms, conditions, endorsements, definitions, and/or exclusions, which National Union hereby reserves and does not waive.

**FIRST CAUSE OF ACTION**

(Declaratory Relief and Determination of No Coverage—Against All Defendants)

58.    National Union re-alleges and incorporates by this reference all preceding paragraphs above, in their entirety, as though fully set forth herein.

59.    The Excess Policy applies to "property damage" only if caused by an occurrence and if the "property damage" occurs within the policy period.

60.    The damages claimed in the Underlying Action do not qualify as "property damage", are not caused by an "occurrence", and did not occur within the policy period of the Excess Policy.

61.    National Union contends that the allegations in the Underlying Action of defective workmanship standing alone do not constitute an "occurrence" and repair of the alleged defective workmanship or product do not constitute "property damage."

62.    To the extent it is shown that the damages claimed in the Underlying Action do qualify as "property damage" caused by an "occurrence," the Underlying Action involves multiple occurrences.

63.    Subject to all other terms of the Excess Policy, the duty to defend and the duty to indemnify are not triggered until "the total applicable limits of Scheduled Underlying Insurance have been exhausted by payment of Loss to which the Excess Policy applies and the total applicable limits of Other Insurance have been exhausted."

64.     The Endurance 2015-2016 Policy qualifies as "Scheduled Underlying Insurance," and did not pay its aggregate limit of $2M.

65.     The Endurance 2016-2017 Policy qualifies as "Other Insurance," and did not pay its aggregate limit of $2M.

66.     Therefore, the duties to defend and to indemnify under the Excess Policy have not been triggered.

67.     Other terms, provisions, exclusions, limitations, or conditions of the Excess Policy preclude and/or limit defense and/or indemnity coverage for the Underlying Action, including but not limited to the follow exclusions: the "contractors" exclusion, the "contractual liability" exclusion, the "impaired property" exclusion, the "damage to property" exclusion, the "your product" exclusion, the "your work" exclusion, the "fungi and mold" exclusion, the "recall of your product/work" exclusion, and the "subsidence" exclusion.

68.     In addition, coverage under the Excess Policy follows the terms, definitions, conditions, and exclusions of the Endurance 2015-2016 Policy, subject to the policy period, limits of insurance, premiums and all other terms, definitions, conditions, and exclusions of the Excess Policy, provided that the coverage under the Excess Policy will not be broader than the coverage provided by the Endurance 2015-2016 Policy.

69.     Various coverage provisions and terms raised by Endurance in its coverage position letters apply to limit or exclude coverage for some or all of the damages claimed in the Underlying Action, including but not limited to the "open roof exclusion" and the "mold and fungus" exclusion.

70.     National Union reserves the right to raise other terms, limitations, endorsements, exclusions and provisions of the Excess Policy and the Endurance 2015-2016 Policy that may apply.

71.     National Union seeks a declaratory judgment, under 28 U.S.C. § 2201, that the allegations and/or claims for damages asserted in the Underlying Action are not covered or potentially covered, are limited, and/or excluded by the foregoing provisions,

1    exclusions, endorsements, terms and conditions of the Excess Policy and the Endurance
2    2015-2016 Policy; and therefore, National Union does not have, and never had, any duty
3    to defend and/or indemnify Legacy or any other purported insured or assignee of any
4    insured.

5         72.    National Union is entitled to an award of its attorneys' fees pursuant to
6    A.R.S. § 12-341.01 because this matter arises out of contract.

7    **SECOND CAUSE OF ACTION**
8    (Declaratory Relief Regarding Purported Morris Agreement—Against All Defendants)

9         73.    National Union re-alleges and incorporates by this reference all preceding
10   paragraphs above, in their entirety, as though fully set forth herein.

11        74.    Legacy and Willow Creek entered into a purported Morris Agreement.

12        75.    Willow Creek seeks to enforce the purported Morris Agreement and
13   stipulated judgment of $5.5 million against National Union.

14        76.    Willow Creek has acknowledged that Endurance paid its $1 million per
15   occurrence limit under the Endurance 2015-2016 Policy and its $1 million per occurrence
16   limit under the Endurance 2016-2017 Policy.

17        77.    Willow Creek has acknowledged that the $2 million paid by Endurance will
18   be an offset to any amounts Willow Creek seeks to recover against National Union.

19        78.    National Union seeks a declaration that the purported Morris Agreement and
20   stipulated judgment are unenforceable against National Union.

21        79.    National Union seeks a declaration that it owed no duties to Legacy before
22   the purported Morris agreement was executed, that there is no coverage for the Underlying
23   Action under the National Union policy, that the Morris agreement is non-complaint, that
24   the stipulated judgment is unreasonable and unenforceable, that inadequate notice of the
25   purported Morris agreement was provided, and that the purported Morris agreement is the
26   result of fraud and collusion.

27        80.    National Union is entitled to an award of its attorneys' fees pursuant to
28   A.R.S. § 12-341.01 because the matter arises out of contract.

**WHEREFORE**, National Union respectfully requests the following affirmative relief and declaration that:

A.    A judicial declaration that the Excess Policy does not provide coverage or potential coverage to defend or indemnify for the allegations and/or claims arising out of the Underlying Action;

B.    A judicial declaration that coverage for the Underlying Action was never triggered under the Excess Policy;

C.    A judicial declaration that coverage for the Underlying Action is excluded and/or limited by the terms, exclusions, endorsements, and provisions set forth above and any other provisions of the Excess Policy that may apply;

D.    A judicial declaration that the purported Morris agreement and resulting stipulated judgment are unenforceable against National Union;

E.    An award of reasonable attorneys' fees pursuant to A.R.S. § 12-341.01;

F.    For costs of suit herein incurred; and

G.    For such other and further relief as the court may deem just and proper.

**RESPECTFULLY SUBMITTED** this 5th day of April, 2024.

**SANDERS & PARKS, P.C.**

By: s/ Jasmina Richter
Jasmina Richter
John C. Quinn
3030 North Third Street, Suite 1300
Phoenix, AZ  85012-3099
*Attorneys for Plaintiff*

Exhibit 1

<u>EXHIBIT C</u>

## SETTLEMENT AGREEMENT

**Parties:**

      A.     Legacy Roofing, LLC ("Legacy"); and

      B.     3137 Willow Creek Road, LLC ("Willow Creek").

(Collectively, the "Parties").

**Recitals:**

      C.     Willow Creek was the owner of a construction project known as the Willow Creek Apartments in Prescott, Arizona (the "Project"). Decca Multi-Family Builders, Inc. ("Decca") was the general contractor pursuant to a prime contract between Willow Creek and Decca. Employers Mutual Casualty Company ("EMC") issued performance and payment bonds with respect to the Project.

      D.     On or about May 27, 2016, Decca and Legacy entered into a Subcontract Agreement (the "Subcontract"), under which Legacy agreed to perform certain work with respect to the Project (the "Legacy Work").

      E.     Various disputes arose between Decca, Willow Creek, EMC, Legacy, and others regarding the construction of the Project. Background relevant here includes the following:

          1.     Willow Creek alleged that Legacy, and Decca through Legacy, performed improper work, committed other breaches of contract and torts, all of which led to property damage and losses that Willow Creek was forced to repair at significant expense, and that Decca and Legacy are liable to Willow Creek and owe Willow Creek indemnity (the "Willow Creek Claims"); and

          2.     Decca alleged that Legacy breached its Subcontract with Decca by failing to properly or timely perform its work, and was otherwise obligated to indemnify Decca (the "Decca Claims").

      F.     In 2017, Decca filed a lawsuit against Willow Creek, *Decca Multi-Family Builders, Inc. v. 3137 Willow Creek Road, LLC*, Yavapai County Superior Court case no. P-1300-CV-201800246 (the "2017 Lawsuit"), in which Decca, EMC, Willow Creek, and Legacy asserted various claims against each other.

      G.     In 2020, Willow Creek filed a separate lawsuit against certain subcontractors, *3137 Willow Creek Road, LLC v. GNM Companies, LLC, et al.*, P-1300-CV-202000542 (the "2020 Lawsuit"), in which Willow Creek sought indemnity. The 2020

EXHIBIT C

Lawsuit was dismissed, which was affirmed on appeal, subject to the final judgment in the 2017 Lawsuit.

       H.     On or about December 21, 2022, Decca, EMC, and Willow Creek entered into a settlement of the claims among each other (the "Decca Settlement"). As a result of the Decca Settlement, Willow Creek has been assigned all of Decca's and EMC's rights against Legacy and other subcontractors, and is pursuing those assigned claims in the 2017 Lawsuit. Legacy acknowledges receipt of a written Assignment to Willow Creek of all contractual, tort and other claims Decca has against Legacy under its Subcontract with Decca or otherwise, such that Willow Creek is the owner of all claims of Decca against Legacy and its insurance, including but not limited to, claims for contractual indemnity obligations, implied and common law indemnity obligations and bad faith.

       I.     Based upon available information and subject to adjustment, Legacy obtained the following insurance during the Project:

| Policy Period | Insurer | Level | Policy No. |
|---|---|---|---|
| 10/11/2015-10/11/2016 | Sompo International / Endurance Insurance ("Sompo") | Primary | CBC20000808700 |
| 10/11/2015-10/11/2016 | National Union ("National Union") | Umbrella | BE 027731677 |
| 10/11/2016-10/11/2017 | Sompo International / Endurance American Specialty Ins. Co. | Primary | CBF10000103800 |

All carriers are collectively referred to herein as "Subcontractor Insurers". Legacy represents that Sompo has provided Legacy a defense, but only under a reservation of rights. Legacy will provide Willow Creek with documentation confirming these arrangements upon request.

       J.     Willow Creek and Decca have made prior offers to Legacy that would have allowed certain Subcontractor Insurers to settle the claims asserted against Legacy within available policy limits. Legacy represents that it has delivered those offers to the Subcontractor Insurers, and demanded that all or some of the Subcontractor Insurers settle within the policy limits, or withdraw all reservations and defend Legacy without reservation, but the Subcontractor Insurers have failed and refused to do so. At the appropriate time and upon request from Willow Creek, Legacy agrees to cooperate with Willow Creek and provide copies of its communications with the Subcontractor Insurers related to coverage and settlement demands and also provide assistance as necessary for the prosecution of the assigned rights referenced herein.

       K.     Prior to entering into this Agreement, (1) Legacy has requested and demanded that National Union provide a defense and/or withdraw its reservation of rights and provide Legacy an unqualified defense and indemnity, and that (2) Legacy has given National Union a prior notice period during which neither a stipulated judgment would be entered into or an assignment of rights would occur, such that the implications thereof could be evaluated. National Union has refused or failed to withdraw its reservation of rights and provide Legacy an unqualified defense and indemnity.

EXHIBIT C

L.    Legacy believes and has asserted that National Union has received Legacy's demands for settlement or a withdrawal of applicable reservations and has breached its contracts with Legacy in bad faith (the "Bad Faith Claims") by, among other things, failing to settle the claims against Legacy within policy limits, despite prior opportunities to do so, and failing to withdraw its reservation of rights and provide Legacy an unqualified defense and indemnity, despite requests and demands by Legacy, considering that Legacy faces exposure above the limits of National Union's policy.

M.    To protect Legacy from the financial calamity of an adverse judgment against it, and after *Morris*-compliant prior notice to the Subcontractor Insurers, Legacy and Willow Creek, have agreed to enter into this Agreement.

**Covenants:**

In consideration of mutual covenants and promises set forth herein and for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties agree as follows:

1.    This agreement shall be effective as of the date it is signed by all of the Parties.

2.    Only upon condition of a written request of Willow Creek and notice having been sent to National Union with a reasonable response time, Legacy shall stipulate to a judgment being entered against Legacy in favor of Decca and Willow Creek, jointly and severally, in the amount of $5,500,000 in the form attached hereto as Exhibit 1 (the "Judgment"). Legacy agrees the Judgment reflects a reasonable and non-collusive amount for its indemnity obligations and other exposure arising out of or related to the Project, the Subcontract, Legacy's indemnity obligations, Legacy's Work, the Willow Creek Claims, the Decca Claims, the 2017 Lawsuit, and the 2020 Lawsuit under all the present circumstances.

3.    Only upon condition of a written request of Willow Creek and notice having been sent to National Union with a reasonable response time, Legacy shall assign to Willow Creek all of its rights and claims against National Union, and its insurance policy relating to the Project, Willow Creek Claims, the Decca Claims, the 2017 Lawsuit, and the 2020 Lawsuit, including Legacy's Bad Faith Claims.

4.    Willow Creek hereby covenants and agrees that it shall not attempt to enforce or collect the Judgment from Legacy's assets or any of its agents other than against the assigned rights and claims against National Union. Willow Creek shall be permitted to pursue collection of the Judgment in whatever manner Willow Creek reasonably deems appropriate. Upon satisfaction of the Judgment or final settlement with National Union, Willow Creek shall file a notice of satisfaction of the Judgment with the Yavapai County Superior Court pursuant to the Arizona Rules of Civil Procedure.

5.    Legacy and its officers, directors, shareholders, members, employees, agents, heirs, successors, and assigns hereby release Willow Creek, Decca, EMC, and their respective officers, directors, shareholders, members, employees, agents,

EXHIBIT C

insurers, heirs, successors, and assigns from all claims, demands, causes of action, damages, liabilities, or losses of any nature whatsoever arising out of or related to the Project, the Subcontract, the Legacy Work, the Willow Creek Claims, the Decca Claims, the 2017 Lawsuit, and the 2020 Lawsuit, including all other Project subcontractors, and further assigns all rights under and to the Project's Builder's Risk Insurance Policies to Willow Creek. This release extends to all such claims, demands, counterclaims, cross claims, causes of action, damages, personal or economic injuries, rights, liabilities, or losses, including attorney's fees, costs and litigation expenses, whether grounded in contract, tort, equity or regulatory violation, which are based upon or arising out of Legacy's scope of work or its Subcontract with Decca, regardless of whether they are fixed, contingent, matured, unmatured, known, unknown, past, present, or future. Legacy shall execute a dismissal of all current counts in the 2017 Litigation. Legacy hereby warrants that it has paid all of its lower tier subcontractors and material suppliers related to the Project and agrees to indemnify Willow Creek only to the extent any such payment claims are asserted as a result of Legacy's failure to pay subcontractors or suppliers related to the Project. Legacy shall also execute statutory release forms as requested by Willow Creek.

6.      At Willow Creek's election, Legacy will assign to Willow Creek the retention agreement Legacy has with its experts in the 2017 Litigation. Willow Creek is also entitled to reasonable post-settlement cooperation from Legacy in Willow Creek's trial preparation or in connection with a reasonableness hearing, if any, and shall have the ongoing right to confer with Legacy's principals to a reasonable degree, but such communication shall proceed through Legacy's attorneys. Legacy will have the right to have counsel present during any discussions, at its election.

7.      If any party files suit or takes any other action to enforce this Agreement, the prevailing party shall be entitled to an award of attorneys' fees and costs. Any disagreements or questions about (i) gateway issues, including the original intentions of the Parties in reaching this Agreement, (ii) the interpretation of the terms and provisions of this Agreement, and (iii) the character and extent of the rights and obligations of the Parties under this Agreement shall be submitted to and finally resolved by mediator Kevin T. Ahern, Esq.

8.      This Agreement shall be governed by Arizona law and venue for any related action shall be in Phoenix, Arizona. If any provision hereof is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Agreement, such provision will be fully severable, and the remainder of the Agreement will remain enforceable and not affected thereby.

9.      This Agreement may be signed in counterparts. Email, PDF, facsimile, and photocopy signatures shall be accepted by the Parties as original signatures and have the same binding effect as original signatures.

10.      This Agreement shall be binding upon and inure to the benefit of the Parties' heirs, successors, devisees, executors, administrators, beneficiaries, and assigns. This Agreement shall have no affect or impact upon Decca's and Willow Creek's claims or rights against any other Project participants.

EXHIBIT C

11.     This Agreement is freely and voluntarily entered into by the Parties and constitutes the full and complete agreement between the Parties.  The Parties have no other understandings or agreements with respect to the matters set forth herein.

12.     The Parties agree to mutually cooperate with each other to effectuate the various terms and provisions of this Agreement and to execute whatever additional documents are deemed necessary or required for that limited purpose.

13.     The parties agree that the fact of settlement may be disclosed, but the specific terms of settlement are sensitive and confidential matters that (excepting the Court and Mediator) shall not be discussed with, provided to, or otherwise revealed or disseminated to any third party whomsoever (by word of mouth, in writing, or by email, social media, or any other written or electronic means), except (i) in compliance with an order of a court, subpoena or other legal procedure, (ii) to a party's attorneys and legal advisors, senior management team, accountants, tax preparation professionals, and insurance carriers (and their underwriters or reinsurers), (iii) as required by the Rules of Professional Conduct or Rules of Civil Procedure, (iv) as necessary to enforce rights and remedies under the terms of the settlement, (v) as necessary to comply with common law, statutory, regulatory or other professional obligations, (vi) with permission of all the parties to the settlement, (vii) as reasonably necessary and required by counsel for the other parties in the case affected by or implicated in any rights and claims assigned by Decca to Willow Creek (including their insurers, builder's risk carriers, underwriters, reinsurers, auditors), (viii) as necessary to fulfill Willow Creek's and Legacy's disclosure obligations to other parties in the case, and (ix) as is reasonably necessary for other parties in the case to have access to such information to assert allocations of fault, set-offs or offsets, and defend against contentions in reasonableness hearings.

14.     Each person executing this Agreement represents and warrants he or she has read the Agreement, has had the opportunity to obtain the advice of counsel with respect to the terms of the Agreement, and is legally empowered and authorized to execute the Agreement on behalf of the party for which he or she acts.

[SIGNATURE PAGE FOLLOWS]

EXHIBIT C

AGREED TO this __ day of _____, 2023.

3137 Willow Creek Road, LLC

By: _____    Member
                                 Its: _____
Date:

Legacy Roofing, LLC

By: _____    Member
Date:                            Its: _____

6

Exhibit 2

David

**From:** Jefferies, Randy <RJefferies@fennemorelaw.com>
**Sent:** Tuesday, April 11, 2023 9:14 AM
**To:** David C. Hungerford <dch@severson.com>
**Cc:** Kevin Ahern <kevin@ahernmediations.com>; KBroerman@jshfirm.com; Barclay.nicholson@sheppardmullin.com
**Subject:** Legacy/Decca

Dear Mr. Hungerford:

Per our last telephone conference, I am providing you some preliminary information confirming that Legacy Roofing's defects in its completed work on the first three buildings existed and had resulted in multiple occurrences and manifest damage before October 2016.  In addition, there were separate occurrences on other buildings as Legacy's work began and continued on new and different buildings after October 2016.  In short, there are clearly multiple unrelated occurrences on distinct buildings before 10/16  and then wholly separate defects and damage on subsequent buildings as Legacy's work proceeded on new buildings after October 2016.  This information confirms there are multiple occurrences trigging the aggregate and excess coverage in both policy periods.  All of this confirms the reasonableness of the previous but now expired demand of $4.0 million.

Please confirm receipt.

John R. Jefferies
Director

# FENNEMORE.

2394 East Camelback Road, Suite 600, Phoenix, AZ 85016-3429
T: 602.916.5313  |  F: 602.916.5513  |  M: 602.618.1200
rjefferies@fennemorelaw.com  |  View Bio



**CONFIDENTIALITY NOTICE:** The information contained in this message may be protected by the attorney-client privilege. If you believe that it has been sent to you in error, do not read it. Please immediately reply to the sender that you have received the message in error. Then delete it. Thank you.

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the

# EXHIBIT 3

## SETTLEMENT AGREEMENT

**Parties:**

      A.     Legacy Roofing, LLC ("Legacy");

      B.     3137 Willow Creek Road, LLC ("Willow Creek");

(Collectively, the "Parties").

**Recitals:**

      C.     Willow Creek was the owner of a construction project known as the Willow Creek Apartments in Prescott, Arizona (the "Project"). Decca Multi-Family Builders, Inc. ("Decca") was the general contractor pursuant to a prime contract between Willow Creek and Decca. Employers Mutual Casualty Company ("EMC") issued performance and payment bonds with respect to the Project.

      D.     On or about May 27, 2016, Decca and Legacy entered into a Subcontract Agreement (the "Subcontract"), under which Legacy agreed to perform certain roofing work with respect to the Project (the "Legacy Work").

      E.     Various disputes arose between Decca, Willow Creek, EMC, Legacy, and others regarding the construction of the Project. Background relevant here includes the following:

          1.     Willow Creek alleged that Legacy, and Decca through Legacy, performed improper work, committed other breaches of contract and torts, all of which led to property damage and losses that Willow Creek was forced to repair at significant expense, and that Decca and Legacy are liable to Willow Creek and owe Willow Creek indemnity (the "Willow Creek Claims");

          2.     Decca alleged that Legacy breached its Subcontract with Decca by failing to properly or timely perform its work, failed to repair the property damage, and was otherwise obligated to indemnify Decca (the "Decca Claims");

          3.     Legacy rejected Decca's demands for indemnity against Willow Creek's damage claims.

      F.     In 2017, Decca filed a lawsuit against Willow Creek, *Decca Multi-Family Builders, Inc. v. 3137 Willow Creek Road, LLC*, Yavapai County Superior Court case no. P-1300-CV-201800246 (the "2017 Lawsuit"), in which Decca, EMC, Willow Creek, and Legacy asserted various claims against each other.

1

G.    In 2020, Willow Creek filed a separate lawsuit against certain subcontractors, *3137 Willow Creek Road, LLC v. GNM Companies, LLC, et al.*, P-1300-CV-202000542 (the "2020 Lawsuit"), in which Willow Creek sought indemnity.  The 2020 Lawsuit was dismissed, which was affirmed on appeal, subject to the final judgment in the 2017 Lawsuit.

H.    During the 2017 Litigation, Decca made monetary demands to Legacy for its then estimated share of Willow Creek's and Decca's damages.  Legacy presented those demands to its primary and excess carriers.  Legacy's insurance carriers never funded or agreed to those indemnity demands.  Legacy was and remains financially incapable of paying Decca's indemnity demands without the participation of its primary and excess insurance carriers.

I.    On or about December 21, 2022, Decca, EMC, and Willow Creek entered into a settlement of the claims among each other (the "Decca Settlement").  As a result of the Decca Settlement, Willow Creek has been assigned all of Decca's and EMC's rights against Legacy and other subcontractors, and is pursuing those assigned claims in the 2017 Lawsuit.  Legacy acknowledges receipt of a written Assignment to Willow Creek of all contractual, tort and other claims Decca has against Legacy under its Subcontract with Decca or otherwise, such that Willow Creek is the owner of all claims of Decca against Legacy and its insurance, including but not limited to, claims for contractual, implied and common law and indemnity obligations and bad faith.

J.    Legacy has been granted judgments for attorneys' fees against Willow Creek in both the 2017 Lawsuit and 2020 Lawsuit (the "Legacy Judgments").

K.    Based upon available information and subject to adjustment, Legacy obtained the following insurance during the Project:

| Policy Period | Insurer | Level | Policy No. |
|---|---|---|---|
| 10/11/2015-10/11/2016 | Sompo International / Endurance Insurance ("Sompo") | Primary | CBC20000808700 |
| 10/11/2015-10/11/2016 | National Union Fire Insurance Company of Pittsburg, P.A. ("National Union") | Umbrella | BE 027731677 |
| 10/11/2016-10/11/2017 | Sompo International / Endurance American Specialty Ins. Co. | Primary | CBF10000103800 |

All carriers are collectively referred to herein as "Subcontractor Insurers".

L.    Willow Creek's claims in the 2017 and 2020 Lawsuits include claims for improper and negligent conduct and resulting property damage during the time periods covered under the insurance policies referenced above.

M.    As reflected in this Settlement Agreement, Sompo has accepted coverage under its policies issued to Legacy and agreed to pay $2,000,000 in settlement under its policies, thereby exhausting its coverage.

N.    Willow Creek's claims in the 2017 and 2020 Lawsuits include claims for resulting property damages for the period of 10/11/15-10/11/16 that are in excess of Sompo's policy limits for that period.

O.    National Union has had opportunities to settle the claims against Legacy within its policy limits but has failed to do so.

P.    To protect Legacy from the financial calamity of an adverse judgment against it in excess of Sompo's policy limits, Legacy and Willow Creek have entered into this Agreement.

**Covenants:**

In consideration of the mutual covenants and promises set forth herein and for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties agree as follows:

1.    This agreement shall be effective as of the date it is signed by all of the Parties.

2.    On behalf of Legacy, Sompo will pay Willow Creek $2,000,000 on or before October 17, 2023.  Upon receipt of such payment, Willow Creek and Legacy will release Sompo from all liability regarding its policies issued in favor of Legacy and expressly reserve all rights against National Union and any other excess coverage available to Legacy. The parties agree that, based on the claims referenced in Paragraphs L and N of the Recitals, Sompo is allocating its payment as follows: $1 million under policy no. CBC20000808700, and $1 million under policy no. CBF10000103800. The parties agree that Sompo's payment exhausts the available limits of policy no. CBC20000808700 and policy no. CBF10000103800.

3.    Within one day of the receipt of this Settlement Agreement, Legacy will send National Union the notice attached as <u>Exhibit A</u> to this Settlement Agreement.

4.    If by October 13, 2023, National Union has neither: (a) agreed to defend Legacy against Willow Creek's claims in the 2017 and 2020 Lawsuits; nor (b) entered into a settlement agreement whereby Legacy obtains a release of the Willow Creek's claims in the 2017 and 2020 Lawsuits, then the following provisions will apply:

    a.    Legacy and Willow Creek will enter into a stipulated judgment  against Legacy in favor of Decca and Willow Creek, jointly and severally for $5,500,000 (the "Judgment") in the form attached hereto as <u>Exhibit B</u>, which Legacy agrees is a reasonable amount for its exposure arising out of or related to the Project, the Subcontract, its indemnity obligations, the Legacy Work, the Willow Creek Claims, the Decca Claims, the 2017 Lawsuit, and the 2020 Lawsuit under all the circumstances.  Sompo's payment of $2.0 million shall be credited against the Judgment.

  b. Legacy will assign to Willow Creek all of its rights against National Union and any other applicable excess or other coverage, including all claims under National Union's Policy No. 27731677 for the policy year 10/11/2015-10/11/2016 referenced above, as well as any bad faith claims, relating to the Project, Legacy's work, the Subcontract, the Willow Creek Claims, the Decca Claims, the 2017 Lawsuit, or the 2020 Lawsuit;

  c. Willow Creek will agree that it will not record the Judgment and that it will not attempt to enforce or collect the Judgment from the assets of Legacy or its agents or Sompo or its agents other than from the pursuit and enforcement of Legacy's assigned rights and claims against National Union and its insurance policies;

  d. Willow Creek will be permitted to pursue collection of the Judgment only against National Union and its policies in whatever manner Willow Creek deems appropriate;

  e. After entry of the Judgment, Willow Creek will be entitled to reasonable post-settlement cooperation from Legacy in Willow Creek's trial preparation and/or pursuit of the assigned rights and shall have the ongoing right to confer with Legacy's principals to a reasonable degree, with Legacy's principals having the right to have counsel present during any discussions, at Legacy's election;

  f. At Willow Creek's election, Legacy will assign to Willow Creek the retention agreement Legacy has with its experts in the 2017 Litigation; and

  g. Upon satisfaction of the Judgment or final settlement with National Union, Willow Creek will file a notice of satisfaction of the Judgment with the Yavapai County Superior Court pursuant to the Arizona Rules of Civil Procedure.

  5. To the extent National Union provides a qualified defense to Legacy and reserves its rights to deny coverage, then Willow Creek will provide Legacy a further opportunity to protect itself by, at that time, offering to enter into an agreement in the form attached as Exhibit C, pursuant to which (if entered) Legacy will (a) demand that National Union either settle within National Union's excess policy limits or withdraw its reservation of rights; or else (b) Legacy will enter into a *Morris* agreement with Willow Creek as set forth in Exhibit C.

  6. Legacy and its officers, directors, shareholders, members, employees, agents, heirs, successors, and assigns hereby release Willow Creek, Decca, EMC, and their respective officers, directors, shareholders, members, employees, agents, insurers, heirs, successors, and assigns from all claims, demands, causes of action, damages, liabilities, or losses of any nature whatsoever arising out of or related to the Project, the

Subcontract, the Legacy Work, the Willow Creek Claims, the Decca Claims, the 2017 Lawsuit, the 2020 Lawsuit, EMC's bonds, and the Legacy Judgments, including all other Project subcontractors, and further assigns all rights under and to the Project's Builder's Risk Insurance Policies to Willow Creek.  This release extends to all such claims, demands, counterclaims, cross claims, causes of action, damages, personal or economic injuries, rights, liabilities, or losses, including attorney's fees, costs and litigation expenses, whether grounded in contract, tort, equity or regulatory violation, which are based upon or arising out of Legacy's scope of work or its Subcontract with Decca, regardless of whether they are fixed, contingent, matured, unmatured, known, unknown, past, present, or future.  Legacy hereby warrants that it has paid all of its lower tier subcontractors and material suppliers related to the Project and agrees to indemnify Willow Creek only to the extent any such payment claims are asserted as a result of Legacy's failure to pay subcontractors or suppliers related to the Project.  Nothing contained herein is intended to waive, release or adversely affect the assigned claims or rights against National Union, nor any defense available to Legacy should National Union provide Legacy a defense.

7.    If any party files suit or takes any other action to enforce this Agreement, the prevailing party shall be entitled to an award of attorneys' fees and costs. Any disagreement regarding the terms of this settlement shall be submitted to and finally resolved by mediator Kevin Ahern, Esq.

8.    The interpretation and enforcement of this Agreement shall be governed by the substantive laws of the state of Arizona, without reference to conflicts of law provisions, and venue for any related action shall be Phoenix, Arizona.  If any provision hereof is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Agreement, such provision will be fully severable, and the remainder of the Agreement will remain enforceable and not affected thereby.

9.    This Agreement may be signed in counterparts.  Email, PDF, facsimile, and photocopy signatures shall be accepted by the Parties as original signatures and have the same binding effect as original signatures.

10.    This Agreement shall be binding upon and inure to the benefit of the Parties' heirs, successors, devisees, executors, administrators, beneficiaries, and assigns. This Agreement shall have no affect or impact upon Decca's and Willow Creek's claims or rights against any other Project participants.

11.    This Agreement is freely and voluntarily entered into by the Parties and constitutes the full and complete agreement between the Parties.  The Parties have no other understandings or agreements with respect to the matters set forth herein.

12.    The Parties agree to mutually cooperate with each other to effectuate the various terms and provisions of this Agreement and to execute whatever additional documents are deemed necessary or required for that limited purpose.

13.    The parties agree that the fact of settlement may be disclosed, but the specific terms of settlement are sensitive and confidential matters that (excepting the Court

and Mediator) shall not be discussed with, provided to, or otherwise revealed or disseminated to any third party whomsoever (by word of mouth, in writing, or by email, social media, or any other written or electronic means), except (i) in compliance with an order of a court, subpoena or other legal procedure, (ii) to a party's attorneys and legal advisors, senior management team, accountants, tax preparation professionals, and insurance carriers (and their underwriters or reinsurers), (iii) as required by the Rules of Professional Conduct or Rules of Civil Procedure, (iv) as necessary to enforce rights and remedies under the terms of the settlement, (v) as necessary to comply with common law, statutory, regulatory or other professional obligations, (vi) with permission of all the parties to the settlement, (vii) as reasonably necessary and required by counsel for the other parties in the case affected by or implicated in any rights and claims assigned by Decca to Willow Creek (including their insurers, builder's risk carriers, underwriters, reinsurers, auditors), (viii) as necessary to fulfill Willow Creek's and Legacy's disclosure obligations to other parties in the case, and (ix) as is reasonably necessary for other parties in the case to have access to such information to assert allocations of fault, set-offs or offsets, and defend against contentions in reasonableness hearings.

14.    Each person executing this Agreement represents and warrants he or she has read the Agreement, has had the opportunity to obtain the advice of counsel with respect to the terms of the Agreement, and is legally empowered and authorized to execute the Agreement on behalf of the party for which he or she acts.

[SIGNATURE PAGE FOLLOWS]

AGREED TO this ___ day of September, 2023.

3137 Willow Creek Road, LLC

By: Cole Johnson
Date: 9.25.2023

Its: Manager

Legacy Roofing, LLC

By: Toby Eberle
Date: 9/25/2023

Its: Member

7