Jasmina Richter/Bar No. 024180
Robert C. Ashley/Bar No. 022335
John C. Quinn/Bar No. 032231
**SANDERS & PARKS, P.C.**
3030 North Third Street, Suite 1300
Phoenix, AZ  85012-3099
Direct Phone: (602) 532-5779
E-Mail: jasmina.richter@sandersparks.com
Firm E-Mail : minutes@sandersparks.com

Robert C. Ashley
Direct Phone: (602) 532-5687
E-Mail: robert.ashley@sandersparks.com

John C. Quinn
Direct Phone: (602) 532-5631
E-Mail: john.quinn@sandersparks.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| National Union Fire Insurance Company of Pittsburgh, PA., a Pennsylvania company, | Case No.:  CV-24-08070-PCT-JJT<br>_____ |
| Plaintiff, | |
| v. | **AMENDED COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** |
| 3137 Willow Creek Road, LLC, an Arizona limited liability company; Decca Multi-Family Builders, Inc., an Arizona corporation; and Legacy Roofing, LLC, an Arizona limited liability company. | |
| Defendants. | |

Plaintiff National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") by and for its Amended Complaint hereby alleges as follows:

### NATURE OF THE ACTION

1.     This is a civil action for declaratory relief through which National Union seeks a declaratory judgment, under 28 U.S.C. § 2201 et seq., that the Commercial Excess

Liability Policy No. 27731677, effective from October 11, 2015 to October 11, 2016 issued to the Named Insured Legacy Roofing, LLC ("Legacy") provides no coverage for the claims and damages sought in an action currently pending in the Superior Court of Arizona for Yavapai County entitled *Decca Multi-Family Builders, Inc. v. 3137 Willow Creek Road, LLC et. al.*, Case No. P-1300-CV-201700675 (the "Underlying Action").

2.     Through this action, National Union seeks a determination that National Union has no indemnity or defense obligations towards Legacy, or any other claimed insured or assignee of any insured's rights, including but not limited to, 3137 Willow Creek Road, LLC ("Willow Creek") or Decca Multi-Family Builders, Inc. ("Decca").

**PARTIES, JURISDICTION AND VENUE**

3.     Plaintiff National Union is a Pennsylvania corporation with its principal place of business in the State of New York and is therefore a citizen of Pennsylvania and New York as defined by 28 U.S.C. § 1332 (c)(1).

4.     Defendant Legacy is a limited liability company with its principal place of business in Arizona.  The sole member of Legacy is Toby Ebarb.  Upon information and belief, Toby Ebarb is a resident and citizen of Arizona.

5.     Defendant Willow Creek is a limited liability company with its principal place of business in Arizona.  The sole member of Willow Creek is The RCJ Irrevocable Trust, and the manager is Robert Cole Johnson.  Upon information and belief, the trustee of The RCJ Irrevocable Trust is Robert Cole Johnson, who is a resident and citizen of Arizona.  Therefore, Willow Creek is a citizen of Arizona as defined by 28 U.S.C. § 1332.

6.     Defendant Decca is an Arizona corporation with its principal place of business in Arizona and is therefore a citizen of Arizona as defined by 28 U.S.C. § 1332 (c)(1).

7.     The amount in controversy in this action exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states.  Notably, Willow Creek and Decca seek to enforce a stipulated judgment in the amount of $5,500,000.00 against

National Union.  Thus, this Court has diversity jurisdiction over this action under 28 U.S.C. § 1332.

8.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) and (2) because the Defendants reside in this District and the events giving rise to this action occurred in this District.

9.    An actual case or controversy has arisen between the parties because Willow Creek and Decca have filed claims in the Underlying Action against Legacy. National Union has accepted the defense of Legacy subject to a reservation of rights.  Willow Creek and Decca, on the one hand, and Legacy, on the other hand, have entered into a Settlement Agreement and Assignment of Rights (the "Legacy Settlement").  See Ex. 1.

10.    Willow Creek and Decca seek to enforce a stipulated judgment against Legacy for $5,500,000.00 against National Union.  As such, an actual controversy exists that requires a judicial declaration to determine the respective rights and obligations of the parties.

## UNDERLYING LAWSUIT

11.    Willow Creek was the owner of an apartment complex located at 3137 Willow Creek Road, Prescott, Arizona (the "Project").

12.    Willow Creek contracted with Fergis & Associates to provide professional design and construction administration services for the Project.

13.    Decca was the general contractor under a prime contract with Willow Creek relating to the Project.

14.    Employers Mutual Casualty Company ("EMC") issued performance and payment bonds with respect to the Project to its principal Decca.

15.    On or about May 27, 2016, Decca and Legacy entered into a Subcontract Agreement under which Legacy agreed to perform certain work with respect to the Project, and Decca agreed to pay Legacy for the work.

16.    Various disputes arose between Decca, Willow Creek, EMC, Legacy, and others regarding the construction of the Project.

17.     For instance, in March and/or April 2017, Willow Creek alleged that it discovered moisture intrusion into the Project and halted construction to investigate.

18.     On September 15, 2017, Decca filed a lawsuit against Willow Creek, Fergis & Associates, Chris Fergis, and Jane Doe Fergis, in Yavapai County Superior Court, Case No. P-1300-CV-201700675.

19.     Decca alleged that Fergis & Associates breached its professional duty to prepare the plans and specifications with reasonable care and breached its construction administration duties.

20.     Decca asserted claims against Fergis & Associates and Chris Fergis for: (1) professional negligence; (2) breach of implied warranty; (3) bad faith; and (4) interference with contract.

21.     Decca also asserted claims against Willow Creek for: (1) breach of implied warranty; (2) prompt pay act violations; (3) breach of contract; (4) breach of fiduciary duty; and (5) bad faith.

22.     On January 10, 2018, Willow Creek filed its Answer and counterclaim against Decca and EMC, including: (1) breach of HUD construction contract; (2) breach of underground construction contract; (3) breach of the implied covenant of good faith and fair dealing; (4) breach of implied warranty; (5) breach of fiduciary duty; (6) fraud; (7) fraudulent concealment; (8) declaratory judgment; (9) tortious interference with business expectancy/prospective business relationship as to HUD; (10) tortious interference with business expectancy/prospective business relationship as to Red Mortgage Capital, LLC; (11) tortious interference with business expectancy/prospective business expectancy as to the City of Prescott; (12) tortious interference with business expectancy/prospective business relations as to Wells Fargo; (13) civil conspiracy; (14) negligence.

23.     Willow Creek also asserted claims against various subcontractors hired by Decca, including Legacy.

24.     The claims by Willow Creek against the subcontractors were later dismissed and the dismissal was affirmed on appeal.

1       25.     On January 26, 2018, Decca filed an Amended Answer to Willow Creek's

2  Counterclaim, Cross-Claims and a Third-Party Complaint against various subcontractors,

3  including Legacy.

4       26.     Decca asserted the following claims against the named subcontractors: (1)

5  indemnification; (2) breach of contract; (3) breach of express warranty; (4) breach of

6  implied warranty; (5) negligence; (6) declaratory judgment.

7       27.     On or about June 13, 2022, after receiving notice of the claim in May of 2022,

8  National Union prepared a letter acknowledging notice of the claim and requesting

9  information about the claim.

10       28.     Willow Creek has attributed the following non-exhaustive list of defects to

11  Legacy's work: improper flashing at all buildings; improper use of torches in parapets;

12  improper roofing underlayment and ice shield installation at all buildings; and, improper

13  scupper installation at buildings 1 through 6.

14       29.     However, the information provided to National Union did not show any

15  resultant damage within its policy period (i.e., before October 11, 2016).

16       30.     On December 19, 2022, Legacy's primary insurer, Endurance American

17  Specialty Insurance Company ("Endurance"), informed National Union that it would be

18  making an offer to Decca of its aggregate limit of $2M under its second policy, effective

19  from October 11, 2016 to October 11, 2017 (the "Endurance 2016-2017 Policy").

20       31.     On or about December 21, 2022, Decca, EMC and Willow Creek entered

21  into a settlement agreement (the "Decca Settlement").

22       32.     As part of the Decca Settlement, Willow Creek claims that it has been

23  assigned all of Decca's and EMC's rights against Legacy, under the Subcontract between

24  Legacy and Decca, and is pursuing those assigned claims in the Underlying Action.

25       33.     In a court order dated July 6, 2023, the court in the Underlying Action ruled

26  that the Decca Settlement and stipulated judgment were not binding on the subcontractors

27  including Legacy.

28

34.     Throughout the Underlying Action, Willow Creek repeatedly asserted that its claimed damages involved multiple occurrences, including in a correspondence dated April 11, 2023.  See Ex. 2.

35.     On September 25, 2023, Willow Creek and Legacy Roofing entered into a settlement agreement. See Ex. 3.

36.     As part of that agreement, Endurance agreed to pay $2M and allocated that payment as follows: $1M under Policy No. CBC20000808700, policy period of October 11, 2015 to October 11, 2016 (the "Endurance 2015-2016 Policy"), and $1M under the Endurance 2016-2017 Policy.

37.     In addition, under paragraph 5 of the agreement, Willow Creek contractually obligated itself to offer Legacy a purported Morris agreement in the form attached as Exhibit C to the agreement, if National Union provided a qualified defense and reserved its rights.

38.     At the time of the September 25, 2023 settlement agreement, National Union had previously agreed to provide a defense to Legacy subject to a reservation of rights.

39.     On or about March 22, 2024, Legacy and Willow Creek entered into a purported Morris agreement (the "Morris Agreement").  *See* Ex. 1.

40.     As part of the purported Morris agreement, Legacy agreed to a stipulated judgment against Legacy and in favor of Decca and Willow Creek jointly for $5.5M.

41.     Further, under paragraph 3, the purported Morris agreement provided that Legacy assigned to Willow Creek all its rights under the National Union policy.

42.     Under paragraph 4 of the purported Morris agreement, Willow Creek covenanted not to execute on the stipulated judgment against Legacy and would only seek enforcement against National Union.

## THE NATIONAL UNION POLICY

43.     National Union issued a Commercial Excess Liability Policy to the Named Insured Legacy Roofing, LLC, policy number 027731677, effective from October 11, 2015 to October 11, 2016 (the "Excess Policy").

44.    The Excess Policy provides commercial excess liability coverage with limits of $3,000,000 each occurrence and $3,000,000 general aggregate and products completed operations aggregate.

45.    The Schedule of Underlying Insurance lists the general liability policy issued by Endurance American Specialty Ins. Co., effective from October 11, 2015 to October 11, 2016, with limits of $1,000,000 per occurrence, $2,000,000 general aggregate, $2,000,000 products and completed operations aggregate and $2,000,000 per project general aggregate.

46.    The Excess Policy provides in the insuring agreement, in relevant part, as follows:

**I. INSURING AGREEMENT—COMMERCIAL EXCESS LIABILITY**
A.  We will pay on behalf of the **Insured** those sums in excess of the **Retained Limit** that the **Insured** becomes legally obligated to pay as damages by reason of liability imposed by law because of **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** to which this insurance applies or because of **Bodily Injury** or **Property Damage** to which this insurance applies assumed by the **Insured** under an **Insured Contract**.  Coverage under this policy will follow the terms, definitions, conditions and exclusions of the **Scheduled Underlying Insurance**, subject to the **Policy Period**, Limits of Insurance, premium and all other terms, definitions, conditions and exclusions of this policy.  Provided, however, that coverage provided by this policy will not be broader than coverage provided by the policy listed in the **Scheduled Underlying Insurance**.

The amount we will pay for damages is limited as described in Section IV, Limits of Insurance.

B.  This policy applies, only if:
1.  The Bodily Injury or Property Damage is caused by an Occurrence that takes place anywhere, and the Bodily Injury or Property Damage occurs during the Policy Period; and
2.  The Personal Injury and Advertising Injury is caused by an Occurrence that takes place anywhere arising out of your business, but only if the Occurrence was committed during the Policy Period.

                                        ***

**III. DEFENSE PROVISIONS**

A. We will have the right and duty to defend any **Suit** against the **Insured** that seeks damages for **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** covered by this policy, even if the **Suit** is groundless, false or fraudulent when the total applicable limits of the **Scheduled Underlying Insurance** have been exhausted by payment of Loss to which this policy applies and the total applicable limits of **Other Insurance** have been exhausted.

\*\*\*

B. We will have no duty to defend the Insured against any Suit seeking damages for Bodily Injury, Property Damage or Personal Injury and Advertising Injury to which this insurance does not apply.

\*\*\*

D. Except as provided in Paragraph A above, we will have no duty to defend any Suit against the Insured.  We will, however, have the right, but not the duty to participate in the defense of any Suit and the investigation of any claim to which this policy may apply.  If we exercise that right, we will do so at our own expense.

47.      The Excess Policy also provides, under Section IV. Limits of Insurance, in relevant part, as follows:

A. The Limits of Insurance shown in Item 3 of the Declarations and the rules below state the most we will pay for all damages under this policy regardless of the number of:
   1. **Insureds**;
   2. claims made or **Suits** brought;
   3. persons or organizations making claims or bringing **Suits**; or
   4. coverages provided under this policy.

\*\*\*

D. Subject to Paragraphs B and C above, the Each Occurrence Limit stated in Item 3A of the Declarations is the most we will pay for the sum of all damages arising out of any one **Occurrence**.

\*\*\*

M. We will not make any payment under this policy unless and until the total applicable limits of **Scheduled Underlying Insurance** have been exhausted by the payment of **Loss** to which this policy applies and any applicable **Other Insurance** have been exhausted by the payment of **Loss.**

- 8 -

When the amount of **Loss** has been determined by an agreed settlement or a final judgment, we will promptly pay on behalf of the **Insured** the amount of such **Loss** falling within the terms of this policy. An agreed settlement means a settlement and release of liability signed by us, the **Insured** and the claimant or the claimant's legal representative.

* * *

48.    The Excess Policy also provides in the exclusions section, in relevant part, as follows:

**V. EXCLUSIONS**

\*\*\*

**C. Contractors**

This insurance does not apply to:

\*\*\*

2.  **Property Damage** to property being installed, erected or worked upon by the **Insured** or by any agents or subcontractors of the **Insured**; or

\*\*\*

**D. Contractual Liability**

This insurance does not apply to any liability for which the **Insured** is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply for damages:

1.  that the **Insured** would have in the absence of a contract or agreement; or

2.  assumed in an **Insured Contract**, provided **Bodily Injury** or **Property Damage** occurs subsequent to the execution and prior to the termination of the **Insured Contract**. Solely for the purposes of liability assumed in an **Insured Contract**, reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an **Insured** are deemed to be damages because of **Bodily Injury** or **Property Damage** and included in the Limits of Insurance of this policy, provided:

    a.  liability to such party for, or for the cost of, that party's defense has also been assumed in the same **Insured Contract**; and

    b.  such attorney fees and litigation expenses are for the defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this policy applies are alleged.

\*\*\*

**F. Damage to Impaired Property or Property Not Physically Injured**

This insurance does not apply to **Property Damage** to **Impaired Property** or property that has not been physically injured, arising out of:

1. a defect, deficiency, inadequacy or dangerous condition in **Your Product** or **Your Work**; or

2. a delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to **Your Product** or **Your Work** after it has been put to its intended use.

\* \* \*

**G. Damage to Property**

This insurance does not apply to **Property Damage** to:

\*\*\*

5. that particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the **Property Damage** arises out of those operations; or

6. that particular part of any property that must be restored, repaired or replaced because **Your Work** was incorrectly performed on it.

\*\*\*

Paragraph 6 of this exclusion does not apply to **Property Damage** included in the **Products-Completed Operations Hazard**.

**H. Damage to Your Product**

This insurance does not apply to **Property Damage** to **Your Product** arising out of it or any part of it.

**I. Damage to Your Work**

This insurance does not apply to **Property Damage** to **Your Work** arising out of it or any part of it and included in the **Products-Completed Operations Hazard**.

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

\* \* \*

**M. Fungus(i), Mold(s), Mildew or Yeast**

This insurance does not apply to **Bodily Injury**, **Property Damage** or **Personal Injury** and **Advertising Injury** or any other loss, injury, damage, cost or expense, including clean up costs that is, but not limited to, losses, costs or expenses related to, arising from or associated with

clean-up, remediation, containment, removal or abatement, caused directly or indirectly, in whole or in part, by:

    a. Any **Fungus(i)** or "spore(s)", or, **Molds(s)**, mildew or yeast, or

    b. Any **Spore(s)** or toxins created or produced by or emanating from such **Fungus(i)**, **Mold(s)**, mildew or yeast, or

    c. Any substance, vapor or, gas, or other emission or organic or inorganic body or substance produced by or arising out of any **Fungus(i)** or "spore(s)", or, **Mold(s),** mildew or yeast, or

    d. Any material, product, building component, building or structure, or any concentration of moisture, water or other liquid within such material, product, building component, building or structure, that contains, harbors, nurtures or acts as a medium for any **Fungus(i)** or, **Mold(s)**, mildew, yeast, or **Spore(s)** or toxins emanating therefrom.

Paragraphs a., b., c. and d. above apply regardless of any other cause, event, material, product and/or building component that contributed **concurrently** or in any sequence to that loss, injury or , damage., cost or expense.

* * *

**V. Recall of Your Product, Your Work or Impaired Property**

This insurance does not apply to damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

    **1. Your Product**;

    **2. Your Work**; or

    **3. Impaired Property;**

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

* * *

**Y. Subsidence**

This insurance does not apply to any liability arising out of subsidence, settling, sinking, slipping, falling away, caving in, shifting, eroding, mud flow, rising, tilting or any other movement of land or earth.

    49.    The Excess Policy also provides, under Section VII. Definitions, in relevant part, as follows:

**VI. DEFINITIONS**

* * *

**K. Fungus(i)** includes, but is not limited to, any of the plants or organisms belonging to the major group Fungi, lacking chlorophyll, and including molds, rusts, mildews, smuts and mushrooms.

**M. Impaired Property** means tangible property, other than **Your Product** or **Your Work**, that cannot be used or is less useful because:

1. it incorporates **Your Product** or **Your Work** that is known or thought to be defective, deficient, inadequate or dangerous; or
2. you have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

1. the repair, replacement, adjustment or removal of **Your Product** or **Your Work**; or
2. your fulfilling the terms of the contract or agreement.

\* \* \*

**O. Insured Contract** means that part of any contract or agreement pertaining to your business under which any **Insured** assumes the tort liability of another party to pay for **Bodily Injury** or **Property Damage** to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement . . .

\* \* \*

**Q. Loss** means those sums actually paid as judgments or settlements, provided, however, that if expenses incurred to defend a **Suit** or to investigate a claim reduce the applicable limits of **Scheduled Underlying Insurance**, then

**Loss** shall include such expenses.

\* \* \*

**U. Occurrence** means:

1. as respects **Bodily Injury** or **Property Damage**, an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general harmful conditions will be deemed to arise out of one **Occurrence**. In the event of continuing or progressively deteriorating damage over any length of time, such damage shall be deemed to be one **Occurrence** and shall be deemed to occur only when such damage first commenced.
2. as respects **Personal Injury and Advertising Injury**, an offense arising out of your business that causes **Personal Injury and Advertising Injury**. All damages that arise from the same, related or repeated injurious material or act will be deemed to arise out of one **Occurrence**, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

**V. Other Insurance** means a valid and collectible policy of insurance providing coverage for damages covered in whole or in part by this policy.

However, **Other Insurance** does not include **Scheduled Underlying Insurance** or any policy of insurance specifically purchased to be excess of this policy affording coverage that this policy also affords.

\* \* \*

**X. Policy Period** means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of termination of this policy.

\* \* \*

**Z. Products-Completed Operations Hazard** means all **Bodily Injury** and **Property Damage** occurring away from premises you own or rent and arising out of **Your Product** or **Your Work** except:

1. products that are still in your physical possession; or
2. work that has not yet been completed or abandoned. However, **Your Work** will be deemed completed at the earliest of the following times:
   a. when all of the work called for in your contract has been completed;
   b. when all of the work to be done at the job site has been completed if your contract calls for work at more than one job site; or
   c. when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**Products-Completed Operations Hazard** does not include **Bodily Injury** or **Property Damage** arising out of:

1. the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you and that condition was created by the loading or unloading of that vehicle by any **Insured**; or
2. the existence of tools, uninstalled equipment or abandoned or unused materials.

\* \* \*

**AA. Property Damage** means:

1. physical injury to tangible property, including all resulting loss of use of that property. All such loss of use will be deemed to occur at the time of the physical injury that caused it; or

2.  loss of use of tangible property that is not physically injured. All such loss of use will be deemed to occur at the time of the **Occurrence** that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks,

CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

BB. **Retained Limit** means the total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance** providing coverage to the **Insured.**

CC. **Scheduled Underlying Insurance** means:

1.  the policy or policies of insurance and limits of insurance shown in the Schedule of Underlying Insurance forming a part of this policy; and
2.  automatically any renewal or replacement of any policy in Paragraph 1 above, provided that such renewal or replacement provides equivalent coverage to and affords limits of insurance equal to or greater than the policy being renewed or replaced.

**Scheduled Underlying Insurance** does not include a policy of insurance specifically purchased to be excess of this policy affording coverage that this policy also afford.

\*\*\*

II. **Your Work** means:

1.  work or operations performed by you or on your behalf; and
2.  materials, parts or equipment furnished in connection with such work or operations.

**Your Work** includes:

1.  warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **Your Work**; and
2.  the providing of or failure to provide warnings or instructions.

3.  the providing of or failure to provide warnings or instructions.

50.    In addition to the Excess Policy terms described herein, there also may be no coverage for the Underlying Action based on other terms, conditions, endorsements, definitions, and/or exclusions, which National Union hereby reserves and does not waive.

### THE ENDURANCE POLICIES

51.    The Schedule of Underlying Insurance lists the general liability policy issued by Endurance, effective from October 11, 2015 to October 11, 2016, with limits of $1,000,000 per occurrence, $2,000,000 general aggregate, $2,000,000 products and completed operations aggregate and $2,000,000 per project general aggregate.

52.    The Endurance 2015-2016 Policy applies to "property damage" only if caused by an "occurrence" and if the "property damage" occurs within the policy period.

53.    The Endurance 2015-2016 Policy defines "Occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

54.    The Endurance 2015-2016 Policy includes the following exclusions: "**a. Expected Or Intended Injury**;" "**b. Contractual Liability**;" "**j. Damage To Property**;" "**k. Damage To Your Product**;" "**m. Damage To Impaired Property or Property Not Physically Injured**;" and "**n. Recall of Products, Work Or Impaired Property**."

55.    The Endurance 2015-2016 Policy also includes a "Roofing Operations Endorsement" that provides as follows:

**A. Open Roof**

1.  The contractor shall cover all "open roofs" if the roof is to be left unattended.  Contractors must take "appropriate" steps to determine adverse weather and provide "appropriate" temporary waterproof covering, able to withstand the elements. If the contractor fails to do either, any resulting "property damage" to any building or structure or its contents will not be covered by this policy.

2. The term "open roofs" as used in this endorsement shall include any roof or sections thereof where any protective covering has been removed leaving exposed the wood shell or any section thereof.

3. The term "appropriate" as used in this endorsement shall mean that conduct or action customarily taken or used by similar roofing contractors in the job-site jurisdiction to protect or prevent damage, or which is customarily done by contractors in the same field under similar circumstances.

**B. Hot Tar or Heat Application Work:**

1. The insured will conduct a diligent inspection of any hot tar or heat application work by the insured, immediately preceding the insured's departure from the premises. The insured will have a designated employee complete a signed and dated written report of each inspection showing the time of the completion of work and the time of the inspection. Copies of all reports shall be maintained by the insured at the insured's office. "We" can request copies of reports at any time.

2. The insured will remain at the job-site of any hot tar or heat application job-site for a period of not less than one hour after the hot tar or heat application process has been completed. The insured will have a designated employee complete a written report stating at the time the hot tar or heat application was finished and the time the insured left the job site. The report must be signed and dated the day of the work and a copy maintained at the insured's office. "We" can request copies of reports at any time.

3. The insured will have at hand a functional, fully charged 15lb. or larger dry chemical fire extinguisher during any hot tar or heat application process work.

4. If the insured fails to meet any of the warranty conditions stated above, any resulting property damage to any building or structure or its contents will not be covered by this policy.

5. In the event of a claim involving hot tar or heat application "we" will require that the designated employee complete an affidavit testifying to the warranty conditions stated above.

56.     Further, by endorsement, the Endurance Policy also includes a "Mold, Fungus, Bacteria, Virus and Organic Pathogen Exclusion," which precludes coverage for "property damage" "arising directly or indirectly, or in concurrence or in any sequence out of or in any way relating to actual, alleged or threatened existence, discharge, dispersal, release or escape or 'organic pathogens,' whether or not such actual, alleged or threatened existence, discharge, dispersal, release or escape is sudden, accidental or gradual in nature."

57.     Endurance also issued a general liability policy, effective from October 11, 2016 to October 11, 2017, with limits of $1,000,000 per occurrence, $2,000,000 general aggregate, $2,000,000 products and completed operations aggregate and $2,000,000 per project general aggregate.

58.     Upon information and belief, the Endurance 2016-2017 Policy contains substantially the same terms as the Endurance 2015-2016 Policy.

59.     In addition to the Endurance Policy terms described herein, there also may be no coverage for the Underlying Action based on other terms, conditions, endorsements, definitions, and/or exclusions, which National Union hereby reserves and does not waive.

## FIRST CAUSE OF ACTION

(Declaratory Relief and Determination of No Coverage—Against All Defendants)

60.     National Union re-alleges and incorporates by this reference all preceding paragraphs above, in their entirety, as though fully set forth herein.

61.     The Excess Policy applies to "property damage" only if caused by an occurrence and if the "property damage" occurs within the policy period.

62.     The damages claimed in the Underlying Action do not qualify as "property damage", are not caused by an "occurrence", and did not occur within the policy period of the Excess Policy.

63.     National Union contends that the allegations in the Underlying Action of defective workmanship standing alone do not constitute an "occurrence" and repair of the alleged defective workmanship or product do not constitute "property damage."

64.     To the extent it is shown that the damages claimed in the Underlying Action do qualify as "property damage" caused by an "occurrence," the Underlying Action involves multiple occurrences.

65.     Subject to all other terms of the Excess Policy, the duty to defend and the duty to indemnify are not triggered until "the total applicable limits of Scheduled Underlying Insurance have been exhausted by payment of Loss to which the Excess Policy applies and the total applicable limits of Other Insurance have been exhausted."

66.     The Endurance 2015-2016 Policy qualifies as "Scheduled Underlying Insurance," and did not pay its aggregate limit of $2M.

67.     The Endurance 2016-2017 Policy qualifies as "Other Insurance," and did not pay its aggregate limit of $2M.

68.     Therefore, the duties to defend and to indemnify under the Excess Policy have not been triggered.

69.     Other terms, provisions, exclusions, limitations, or conditions of the Excess Policy preclude and/or limit defense and/or indemnity coverage for the Underlying Action, including but not limited to the follow exclusions: the "contractors" exclusion, the "contractual liability" exclusion, the "impaired property" exclusion, the "damage to property" exclusion, the "your product" exclusion, the "your work" exclusion, the "fungi and mold" exclusion, the "recall of your product/work" exclusion, and the "subsidence" exclusion.

70.     In addition, coverage under the Excess Policy follows the terms, definitions, conditions, and exclusions of the Endurance 2015-2016 Policy, subject to the policy period, limits of insurance, premiums and all other terms, definitions, conditions, and exclusions of the Excess Policy, provided that the coverage under the Excess Policy will not be broader than the coverage provided by the Endurance 2015-2016 Policy.

71.     Various coverage provisions and terms raised by Endurance in its coverage position letters apply to limit or exclude coverage for some or all of the damages claimed

1 in the Underlying Action, including but not limited to the "open roof exclusion" and the
2 "mold and fungus" exclusion.

3     72.    National Union reserves the right to raise other terms, limitations,
4 endorsements, exclusions and provisions of the Excess Policy and the Endurance 2015-
5 2016 Policy that may apply.

6     73.    National Union seeks a declaratory judgment, under 28 U.S.C. § 2201, that
7 the allegations and/or claims for damages asserted in the Underlying Action are not covered
8 or potentially covered, are limited, and/or excluded by the foregoing provisions,
9 exclusions, endorsements, terms and conditions of the Excess Policy and the Endurance
10 2015-2016 Policy; and therefore, National Union does not have, and never had, any duty
11 to defend and/or indemnify Legacy or any other purported insured or assignee of any
12 insured.

13     74.    National Union is entitled to an award of its attorneys' fees pursuant to
14 A.R.S. § 12-341.01 because this matter arises out of contract.

15 **SECOND CAUSE OF ACTION**
16 (Declaratory Relief Regarding Purported Morris Agreement—Against All Defendants)

17     75.    National Union re-alleges and incorporates by this reference all preceding
18 paragraphs above, in their entirety, as though fully set forth herein.

19     76.    Legacy and Willow Creek entered into a purported Morris Agreement.

20     77.    Willow Creek seeks to enforce the purported Morris Agreement and
21 stipulated judgment of $5.5 million against National Union.

22     78.    Willow Creek has acknowledged that Endurance paid its $1 million per
23 occurrence limit under the Endurance 2015-2016 Policy and its $1 million per occurrence
24 limit under the Endurance 2016-2017 Policy.

25     79.    Willow Creek has acknowledged that the $2 million paid by Endurance will
26 be an offset to any amounts Willow Creek seeks to recover against National Union.

27     80.    National Union seeks a declaration that the purported Morris Agreement and
28 stipulated judgment are unenforceable against National Union.

81.   National Union seeks a declaration that it owed no duties to Legacy before the purported Morris agreement was executed, that there is no coverage for the Underlying Action under the National Union policy, that the Morris agreement is non-complaint, that the stipulated judgment is unreasonable and unenforceable, that inadequate notice of the purported Morris agreement was provided, and that the purported Morris agreement is the result of fraud and collusion.

82.   National Union is entitled to an award of its attorneys' fees pursuant to A.R.S. § 12-341.01 because the matter arises out of contract.

**WHEREFORE**, National Union respectfully requests the following affirmative relief and declaration that:

A.   A judicial declaration that the Excess Policy does not provide coverage or potential coverage to defend or indemnify for the allegations and/or claims arising out of the Underlying Action;

B.   A judicial declaration that coverage for the Underlying Action was never triggered under the Excess Policy;

C.   A judicial declaration that coverage for the Underlying Action is excluded and/or limited by the terms, exclusions, endorsements, and provisions set forth above and any other provisions of the Excess Policy that may apply;

D.   A judicial declaration that the purported Morris agreement and resulting stipulated judgment are unenforceable against National Union;

E.   An award of reasonable attorneys' fees pursuant to A.R.S. § 12-341.01;

F.   For costs of suit herein incurred; and

G.   For such other and further relief as the court may deem just and proper.

**RESPECTFULLY SUBMITTED** this 25th day of September, 2024.

/ / /

/ / /

/ / /

1

2                                    **SANDERS & PARKS, P.C.**

3

4                                    By: s/ *Robert C. Ashley*
                                         Jasmina Richter
5                                        Robert C. Ashley
                                         John C. Quinn
6                                        3030 North Third Street, Suite 1300
                                         Phoenix, AZ  85012-3099
7                                        *Attorneys for Plaintiff*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing thereby transmitting a Notice of Electronic Filing to all CM/ECF registrants.

/s/ *Laura M. Nagelkirk*